UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT BONNEVILLE a/k/a WILL ELLWANGER,

Plaintiff,

v.

KITSAP COUNTY, a municipal corporation, KITSAP COUNTY HEALTH DISTRICT, STEPHEN MOUNT, TIMOTHY QUAYLE, THOMAS WIGGINS, and MICHAEL BARTH,

Defendants.

Case No. C06-5228RJB

ORDER GRANTING PARTIAL SUMMARY JUDGMENT, DENYING INJUNCTIVE RELIEF

This matter comes before the Court on Plaintiff's Motion for Summary Judgment and Injunctive Relief (Dkt. 49-1), Defendants Kitsap County, Stephen Mount, and Michael Barth's Cross Motion for Summary Judgment (Dkt. 53), and Defendants Kitsap County Health District, Timothy Quayle and Thomas Wiggins' Cross Motion for Summary Judgment (Dkt. 57). The Court has considered the pleadings filed in support of and in opposition to these motions and the file herein.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This dispute concerns improvements on properties located in Kitsap County, Washington. Dkt. 1-3. On April 3, 2006, Plaintiff filed, pro se, a complaint against Defendants in Kitsap County Superior Court. Dkt. 1-2. The complaint was amended on April 25, 2006, alleging the following claims: 1)

Defendants violated Plaintiff's Due Process and Equal Protection rights under both the federal and state constitutions contrary to 42 U.S.C. § 1983 and state common law, and 2) Defendants conspired to violate Plaintiff's constitutional rights contrary to 42 U.S.C. § 1985(3). Dkt. 1-3, at 30-33. On April 25, 2006, the case was removed to this Court. Dkt. 1-1.

Plaintiff was given leave to amend his Complaint on July 8, 2006. Dkt. 46. Plaintiff filed his Second Amended Complaint on August 14, 2006, adding allegations that the Defendants conducted "many unlawful, nonconsensual, warrantless searches and seizures of Plaintiff's property." Dkt. 47, at 35-36.

Plaintiff filed a Motion for Summary Judgment on November 20, 2006, and noted it for consideration on December 15, 2006. Dkt. 49-1. Defendants Kitsap County, Stephen Mount, and Michael Barth filed a Response and Cross Motion for Summary Judgment. Dkt. 53. Defendants Kitsap County Health District, Timothy Quayle, and Thomas Wiggins also filed a Response and Cross Motion for Summary Judgment. Dkt. 57. The motions were re-noted for January 5, 2007. Dkt. 61.

The Plaintiff requests that the Court find that "Defendants violated Plaintiff's civil rights by conducting warrantless, non-consensual searches and seizures of Plaintiff's property," and further requests the Court to enjoin the Defendants from conducting warrantless, non-consensual searches and seizures of Plaintiff's property in the future and from using evidence obtained through the alleged searches for purposes of prosecuting the Plaintiff. Dkt. 49-1. In his Motion for Summary Judgment (Dkt. 49-1), Plaintiff does not clearly raise state as well as federal claims. Defendants request that the Court deny Plaintiff's motion for summary judgment and grant Defendants' cross-motions for summary judgment on Plaintiff's apparent Fourth Amendment of the U.S. Constitution and Article 1, Section 7 of the Washington Constitution claims. Dkt. 53; Dkt. 57. The individual Defendants also request protection based on qualified immunity. Dkt. 53; Dkt. 57.

This Order first addresses the facts of the case, detailing (1) a description of the properties; (2) the alleged Kitsap County Health District, Timothy Quayle, and Thomas Wiggins' searches and seizures; and (3) the alleged Kitsap County Department of Community Development, Stephen Mount, and Michael Barth's searches and seizures. Next, this Order examines the Fourth Amendment to the U.S. Constitution claim made pursuant to 42 U.S.C. § 1983 and the Defendants' qualified immunity claims. Then this Order

examines Plaintiff's Article 1, Section 7 claims, if any. Last, this Order addresses Plaintiff's request for a permanent injunction.

The Plaintiff, Mr. Bonneville, owns two pieces of property that are the subjects of the summary judgment motions. Dkt. 49-1. The first property, called the "Illahee property," is located at 5638 Ilahee Road NE, Bremerton, Washington. Dkt. 49-1, at 6. Plaintiff purchased the Illahee property in 2001. Dkt. 49-1, at 2. At the time of the purchase, the Illahee property was a "distressed" property (Dkt. 47, at 16) and consisted of .32 acres, a single-family residence (Dkt. 45), and small accessory buildings, including a "boathouse" and "cabana." Dkt. 49-1, at 3. The Illahee property is surrounded by a tall, cedar fence, which abuts the street and is adjacent to a detached garage. Dkt. 49-1, at 24, 27. The Plaintiff and Defendants disagree whether a "No Trespassing" sign was posted on the fence or garage. Dkt. 62, at 4; Dkt. 54, at 2. Only the garage and fence are visible from the street. 49-1, at 26-29. Once through the gate, the entire property is open to view: the single-family residence and the "cabana" are located on the hillside, and the "boathouse" is located at the bottom of the hill on the edge of Puget Sound. Dkt. 27-3, at 5-10. Mr. Bonneville claims that at "relevant times to this proceeding, [he] allowed a relative to live at [his] Illahee property as a caretaker . . . . [and] even while [his] relative caretook [sic] [his] property, [he] stayed there on weekends for recreation and while construction was ongoing." Dkt. 49-1, at 24. However, Defendants contend that the Illahee property was an "unoccupied" property, alleging that no furniture or personal items were found at the property, only construction materials. Dkt. 67, at 2.

The second property, called the "Bethel-Burley" property, is a vacant, undeveloped parcel of land. Dkt. 66. The Bethel-Burley property is located at 15161 Bethel Burley Rd. SE, Port Orchard, Washington. Dkt. 49-2, at 12. The Bethel-Burley property is heavily wooded (Dkt. 54, at 11) and the parties disagree whether it contains several fences and "No Trespassing" signs. Dkt. 54, at 3; Dkt. 27-5, at 11-15. The Plaintiff has placed a single-wide trailer in a small clearing on the property. Dkt. 54, at 11.

**A. KITSAP COUNTY HEALTH DISTRICT INSPECTIONS OF THE ILLAHEE PROPERTY**

Plaintiff alleges that the Kitsap County Health District ("Health District") conducted four non-consensual, warrantless searches and seizures at his Illahee property. The first Health District inspection at issue here occurred on January 30, 2004. Nathan Holburn, a Health District employee, inspected the Illahee property because the Health District had received a complaint alleging that a new septic tank had

been installed at the "boathouse" on the Illahee property.  Dkt. 27-4, at 13, 15; Dkt. 49-1, at 3.  In his investigation notes, Mr. Holburn wrote that he walked through the front gate and knocked on the doors of the property buildings.  Dkt. 27-4, at 9.  Receiving no answer, he proceeded to take pictures of the property.  Dkt. 27-4, at 9.  Mr. Holburn did not enter any of the buildings, nor did he observe a "No Trespassing" sign.  Dkt. 27-4, at 9.  He seized nothing.  Dkt. 27-4, at 9.  A Health District employee, Mr. Wiggins, e-mailed Mr. Bonneville  on February 5, 2004 with an "update . . . as to the status of the Health District Complaint and the proposed new building," indicating that "[a] Health District inspector visited the site and could not verify if an illegal septic tank had been installed for the 'boat house.'" Dkt. 27-4, at 13.  No evidence in the record exists showing whether Mr. Bonneville responded to the e-mail or protested this Health District inspection.

On November 24, 2004, the Plaintiff applied for and was granted a "Building Clearance" by the Kitsap County Health District for an on-site sewage system at his Illahee property.  Dkt. 27-4, at 15; Dkt. 27-3, at 14.  Under the Kitsap County Code and established procedures, a Building Clearance may not be issued without site visits to evaluate the application.  Kitsap County, Wash., Code § 14.04.265; (providing that "where parcels are serviced by on-site sewage disposal systems, . . . an accepted building clearance, approved by the Kitsap County Health District, is required for [certain construction activity]"); Kitsap County, Wash. Code § 14.04.860 (providing that "all construction work for which a permit is required shall be subject to inspection by the . . . health officer in accordance with the requirements of this code"); Dkt. 45, at 3.  Kerrie Crawford, a Health District employee, approved the Building Clearance for the cabana, boathouse, and lower level remodel of the house, but conditioned the approval on no plumbing in the cabana.  Dkt. 27-3, at 14.

The second Health District inspection at issue occurred on December 15, 2005.  Dkt. 27-3, at 10-11.  The Health District visited the property as a result of a complaint of code violations and septic system problems from DCD employees who had visited the Illahee property on December 12, 2005.  Dkt. 27-3, at 10-11.  The record indicates that Defendant Tim Quayle, the Environmental Health Supervisor for the Health District,  and Kerrie Crawford visited the site and took photos of the property but seized nothing.  Dkt. 27-3, at 14.  Kerrie Crawford testified that "[b]ecause there is only one access route, on all occasions that I or any other Health District employee visited the property when Plaintiff was not present, we

traveled directly to the front door in order to obtain permission to inspect the property." Dkt. 45, at 2-3. During this inspection, the Health District employees noticed several code violations (Dkt. 27-3, at 10-11); for example, Mr. Bonneville had "[a] new water line under [the] cabana," (Dkt. 27-2, at 2), which was prohibited by the Building Clearance conditions. Based on the complaint and the noted violations, the Health District rescinded the Plaintiff's permit approval and ordered that the residence be vacated. Dkt. 27-3, at 10-11.

The third Health District inspection at issue occurred on January 18, 2006. Dkt. 27-3, at 10-11. At that time, Tim Quayle, along with Michael Barth and Stephen Mount, employees of the DCD, inspected the property as a "follow up." Dkt. 27-3, at 11. They seized nothing. Dkt. 27-3, at 11. As a result of the January 18th inspection, the residence was posted as a "dangerous building" in accordance with Article 9 of the Kitsap County Code for the Abatement of Dangerous Buildings. Dkt. 27-3, at 11; Dkt. 57, at 5.

The fourth inspection at issue occurred on March 14, 2006. Dkt. 27-2, at 2; Dkt. 49-1, at 5. Mr. Bonneville does not allege the particular facts of the site visit (Dkt. 49-1, at 5); rather, he merely states that on "March 14, 2006, Defendant Quayle conducted a non-consensual, warrantless search and seizure at the Illahee property." Dkt. 49-1, at 5. The Health District, in its response, did not address the March 14th inspection. Dkt. 57, 4-6. However, the record shows that the March 14th visit occurred after the DCD had vacated the property and posted "do not occupy" signs. Dkt. 27-2, at 2.

**B. KITSAP COUNTY DEVELOPMENT CENTER DEPARTMENT INSPECTIONS OF THE ILLAHEE AND BETHEL-BURLEY PROPERTIES**

*1. Illahee Property*

In February of 2003, the Plaintiff applied to the Kitsap County Development Center Department ("DCD") for a permit to remodel the basement of his Illahee property residence (Dkt. 49-2, at 19; Dkt. 45, at 3). On March 14, 2003, the DCD issued a permit (#03-06614) to Mr. Bonneville to remodel the foundation of the basement. Dkt. 27-3, at 10. On June 16, 2004, Mr. Bonneville applied to the DCD for a permit for residential repairs. Dkt. 27-3, at 10. The DCD granted the permit (#04-44426). Dkt. 27-3, at 10.

The first inspection at issue occurred on December 12, 2005. Dkt. 54, at 2; Dkt. 49-1, at 5. DCD employees, Mr. Barth and Mr. Mount, visited the property in response to a complaint filed (Dkt. 27-2, at 1) alleging that work was being performed on the property without or beyond the scope of a permit. Dkt. 54, at 2; Dkt. 27-3, at 10-11. Mr. Barth and Mr. Mount assert that at the time of their inspection the property was gated, but the fence was unlocked, and they did not observe a "No Trespassing" sign. Dkt. 54, at 2; Dkt. 55, at 2. While on the property, they encountered a worker, "Bob," who proceeded to show them around the property. Dkt. 54, at 2; Dkt. 55, at 2. They seized nothing. Dkt. 54, at 2.

The second inspection at issue occurred on January 18, 2006. Dkt. 54, at 2; Dkt. 49-1, at 5. At that time, Mr. Barth and Mr. Mount accompanied Tim Quayle, the Environmental Health Supervisor for the Health District, to an inspection of the property as a "follow up." Dkt. 27-3, at 11. Mr. Barth and Mr. Mount entered the property via the "access route" with the intention of contacting any person present at the property regarding the construction activities. Dkt. 55, at 2. They did not find anyone present; the basement was open and unoccupied, and the "boathouse" was open and unoccupied. Dkt. 55, at 2. The doors to both structures were standing open, and Mr. Mount and Mr. Barth went inside the structures and observed the conditions, but they seized nothing. Dkt. 55, at 2.

As a result of the January 18th inspection, the DCD classified the residence as a "dangerous building" in accordance with Article 9 of the Kitsap County Code for the Abatement of Dangerous Buildings. Dkt. 27-3, at 11; Dkt. 57, at 5; Kitsap County, Wash., Code § 9.56.010-.110.

*2. Bethel-Burley Property*

On February 1, 2006, Defendants Mr. Mount and Mr. Barth inspected the Plaintiff's Bethel-Burley property. Dkt. 54, at 3. The DCD's stated purpose of this visit was that "it appeared that Plaintiff was installing a mobile home without a permit." Dkt. 53, at 5. However, Plaintiff contends that Mr. Mount and Mr. Barth traveled to the property on "their own volition" because they wanted to see if there were "any building code violations on the property even though no permits had ever been taken out for that property." Dkt. 53, at 5.

Mr. Mount and Mr. Barth state that on their February 1st visit, they observed a vacant lot where the only structure was the manufactured home. Dkt. 54, at 3. They also state that no fences or barricades existed on the property and that they entered the property to verify whether the manufactured home had

the proper permits. Dkt. 54, at 3.  Mr. Mount and Mr. Barth took pictures of the property during this visit, but seized nothing. Dkt. 54, at 3.  In contrast to the Defendants' statements, Mr. Bonneville alleges that the Defendants walked past "two closed gates, a chained barricade and several no trespassing signs in order to take pictures and obtain evidence of alleged code violations." Dkt. 49-1, at 8.

On February 9, 2006, Jason Rice and Robbyn Myers, employees of Kitsap County, performed a follow up site visit to the Bethel-Burley property. Dkt. 56; Dkt. 58.  During the visit, Mr. Rice and Ms. Myers investigated whether the mobile home lacked the proper permit and was improperly located on wetlands. Dkt. 56; Dkt. 58.  Again, the Defendants seized nothing, and state that no fences or signs were posted on the property at this time. Dkt. 56; Dkt. 58.  Mr. Rice and Ms. Myers confirmed during this visit that the trailer was improperly located on wetlands.  Dkt. 56; Dkt. 58.

## II.  DISCUSSION

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*,

809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B. FOURTH AMENDMENT TO U.S. CONSTITUTION CLAIM PURSUANT TO 42 U.S.C. § 1983**

A private right of action exists against every person "who, under color of state law or custom 'subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Owen v. City of Independence*, 445 U.S. 622, 635 (quoting 42 U.S. C. § 1983). This right of action exists against natural persons as well as municipal corporations. *Id.*

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court has established a two-part analysis for determining whether qualified immunity is appropriate in a suit against a government official for an alleged violation of a constitutional right. *Boyd v. Benton County*, 374 F.3d 773, 778 (9th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A court required to rule upon qualified immunity must examine (1) whether the government official violated the plaintiff's constitutional rights on the facts alleged and (2) if there was a violation, whether the constitutional rights were clearly established. *Id.* (internal citations omitted). As to the first inquiry, where "no constitutional right would have been violated were the allegations established, there is no necessity for further inquires concerning qualified immunity." *Saucier*, 533 U.S. at 201. As to the second inquiry, if the law did not put the government official on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Id.* at 202.

The statute of limitations "for a § 1983 claim is generally the applicable state-law period for personal-injury torts." *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 124 n.5 (2005) (citing *Wilson v. Garcia*, 471 U.S. 261, 275 (1985)). Washington's applicable state-law period runs three years. RCW § 4.16.080. Plaintiff filed his complaint on April 3, 2006. Dkt. 1-2, at 35. Insofar as Plaintiff alleges violations prior to April 3, 2003, those § 1983 claims are barred by the statute of limitations and will not be considered. This opinion will now examine whether the Plaintiff's Fourth Amendment rights were violated.

*1. Violation of the Fourth Amendment*

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [that] no Warrants shall issue but upon probable cause . . . ." The "touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo,* 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967)). Whether a person has a constitutionally protected reasonable expectation of privacy depends on two factors: (1) whether the individual has manifested a "subjective expectation of privacy in the object of the challenged search," and (2) whether "society is willing to recognize that expectation as reasonable." *Id.*

The Plaintiff alleges four searches and seizures of his Illahee property conducted by the Health District, two searches and seizures of his Illahee property conducted by the DCD, and two searches and seizures of this Bethel-Burley property also conducted by the DCD . This opinion will analyze the four alleged Health District Illahee property searches and seizures first. Next, this opinion will analyze the four alleged DCD searches and seizures, starting with the Illahee proeprty.

a. Health District, Timothy Quayle, and Thomas Wiggins Inspections of the Illahee Property on January 30, 2004 and December 15, 2005

As explained above, on January 30, 2004, Nathan Holburn entered the Illahee premises because the Health District had received a complaint alleging that a new septic tank had been installed at the "boathouse." Dkt. 27-4, at 13; Dkt. 49-1, at 3. Mr. Holburn walked through the front gate, down the steps, and to the front door. Dkt. 27-4, at 9. After knocking and receiving no answer, he proceeded to

observe the yard and boathouse area. Dkt. 27-4, at 9. He took pictures of the property (Dkt. 27-4, at 10-12) and left, having never entered a building on the premise. Dkt. 27-4, at 9.

On December 15, 2005, the Health District received a complaint from Defendant Steve Mount, a DCD employee, that the Plaintiff had gone beyond the scope of his building permits. Dkt. 27-2, at 1. In response, Health District employees, Tim Quayle and Kerry Crawford, visited the Illahee property. Dkt. 27-2, at 2-4. The record shows that during this visit the employees entered the front gate, took pictures of the property, and observed the condition of one of outbuildings, the "cabana." Dkt. 27-2, at 2-3. Neither the Plaintiff nor the Health District allege that the Health District employees entered any part of the property buildings. Dkt. 49-1, at 5; Dkt. 27-2, at 2-3.

The Illahee property is only accessible by walking through the front gate of the cedar fence; thus, anyone attempting to contact someone residing in the home must pass through the gate. Dkt. 45, at 2-3. After one passes through the front gate, the entire property is open to view. Dkt. 45, at 2-3. Additionally, the boathouse and other structures are clearly visible from the Puget Sound, a heavily trafficked waterway. Dkt. 57, at 5; Dkt. 49-1, at 24; Dkt. 54, at 18; Dkt. 27-2, at 6-10.

The January 30, 2004, and December 15, 2005, Health District inspections of Plaintiff's Illahee property did not constitute Fourth Amendment searches because they occurred in "open fields." *See United States v. Dunn*, 480 U.S. 294, 304 (1987). The term "open field" is a legal term of art and is somewhat of a misnomer in that an "open field need be neither 'open' nor a 'field'" and may include "any unoccupied or undeveloped area outside of the curtilage." *Oliver v. United States*, 466 U.S. 170, 180 n.11 (1984). "Curtilage" is defined as the area immediately surrounding a home "that harbors the 'intimate' activity associated with the 'sanctity of a man's home and the privacies of life.'" *Dunn*, 480 U.S. at 300 (quoting *Oliver*, 466 U.S. at 180). Thus, any search which occurs outside of the home and curtilage in an unoccupied or undeveloped area is considered an "open field" search. *See id.*

Curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301. The factors should be used as "analytical tools only" to the degree that, "in any given case, they bear upon the centrally relevant

consideration–whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

No reasonable expectation of privacy exists outside of curtilage in "open fields." *Id.* at 177. In *Dunn*, the Supreme Court, relying on the open fields doctrine, found no Fourth Amendment violation where the government's conduct was much more intrusive than the conduct involved here. *See id.*, 480 U.S. at 304-05. There, police officers crossed over the property owner's ranch-style perimeter fence and several other interior fences to look into the window of a locked barn. *Id.* The officers did not enter the barn, but "stood outside the curtilage of the house and in the open fields . . . and peered into the barn's open front." *Id.* As such, the Constitution "did not forbid them to observe" the illegal activity in the owner's barn. *Id.*

Here, the Health District's actions on January 30, 2004, and December 15, 2005, did not pass beyond the level of observation the Court found acceptable in *Dunn*. Although Plaintiff has taken steps to hide his property from the view of passers-by on the street by erecting a tall cedar fence enclosing the house, boathouse, yard and cabana, the boathouse and yard are still not within protected "curtilage." Anyone wishing to speak with the Plaintiff or ask for permission to conduct an inspection *must pass through* the gate. And "[a]bsent express orders from the person in possession [of the property] . . . there is no rule of private or public conduct which makes it illegal per se . . . for anyone openly or peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle.'" *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964). Once through the gate, the entire parcel is open to viewing. Further, the boathouse and yard are easily seen from the water. "It is well established that it is not a search to observe what is open and patent." *Id.* at 305. In such a situation, the boathouse and yard are not a part of the curtilage because they are not "intimately tied" to the home itself.

In a factually similar case, the Sixth Circuit recently held that a warrantless inspection conducted by the township's zoning administrator did not amount to a Fourth Amendment violation, even though that inspector drove past a metal gate and several "No Trespassing" signs to observe the property owner's house. *Widgren v. Maple Grove Township*, 429 F.3d 575, 579-80 (6th Cir. 2005). The court noted that the administrator did not violate the Fourth Amendment, even though he entered the Plaintiff's property, because there "is no constitutional difference between police observations conducted while in a public

place and while standing in the open fields." *Id.* at 579 (internal quotations omitted) (quoting *Dunn*, 480 U.S. at 304). It follows that the Kitsap County Health District employee's similar conduct was not an unreasonable search within the meaning of the Fourth Amendment.

Further, Plaintiff had applied for and was granted a Building Clearance from the Health District on November 29, 2004. Dkt 27-3, at 14. The Building Clearance was conditioned on Plaintiff's promise not to install plumbing in the cabana. Dkt. 27-3, at 14. When the Health District returned on December 15, 2005, it was because it had received a complaint that Plaintiff was working beyond the scope of that permit. Dkt. 27-2, at 1. And, indeed, the Health District confirmed that Plaintiff was attempting to install plumbing at the cabana. Dkt. 27-3, at 1. When the Plaintiff applied for a Building Clearance, he necessarily consented to site visits to evaluate the application and inspections to determine compliance. The Kitsap County Building and Fire Code states that upon "building permit application, where parcels are serviced by on-site sewage disposal systems, an . . . accepted building clearance, approved by the Kitsap County Health District, is required for [certain construction]," and in addition, "no building permit application shall be complete unless or until evidence of an adequate . . . sewage disposal system is provided." Kitsap County, Wash., Code § 14.04.265. Moreover, the health officer "shall have authority as necessary in the interest of public health, safety, and general welfare to perform inspections and enforce the provisions of this code . . . . [and] all construction work for which a permit is required shall be subject to inspections by the . . . health officer ." Kitsap County, Wash., Code § 14.04.860. When Plaintiff applied for a Building Clearance, he impliedly permitted Health District inspections as the Code makes clear that construction sites are subject to compliance inspections.

Accordingly, the Health District employees' conduct during their inspections of the Illahee property on September 30, 2004, and December 15, 2005, did not amount to unreasonable searches or seizures under the Fourth Amendment.

b. Kitsap County Health District Employee Timothy Quayle and Kitsap County DCD Employees, Michael Barth and Stephen Mount Inspection on January 18, 2006 of the Illahee Property

On January 18, 2006, Tim Quayle "participated in the [January 18, 2006] inspection" along with DCD employees, Defendants Barth and Mount of Plaintiff's Illahee property. Dkt. 57, at 5; Dkt. 27-3,

at 11. Defendant Quayle does not describe in detail the events of that inspection. However, Defendants Barth and Mount state the following:

> [W]e accessed the property via the access route. We entered the property to contact any persons present at the property regarding the construction activities. There was no one present at the site or in any of the structures. We also intended to post the proposed single-family residence as a dangerous structure. The basement of the proposed single-family residence was open and unoccupied. The proposed boathouse, which was previously declared a dangerous building, was also open and unoccupied. As both structures had doors standing open and it was clearly apparent that they were unoccupied Mr. Mount and I made observations of the inside of the structures.

Dkt. 55, at 2.

The Defendants do not state whether Mr. Quayle accompanied Mr. Barth and Mr. Mount into the property structures (*See* Dkt. 55, at 2, Dkt. 57, at 5), and the Plaintiff merely alleges that "[o]n January 18, 2006, Defendants Quayle, Mount, and Barth conducted a non-consensual, warrantless search and seizure at the Illahee property." Dkt. 49-1. Thus, for the purposes of this order, it is assumed that Mr. Quayle accompanied Mr. Barth and Mr. Mount into the structures.

Even assuming that the Mr. Quayle entered the structures on the Illahee property without first obtaining a warrant, Mr. Quayle's actions still do not rise to the level of an unreasonable search and seizure under the Fourth Amendment. A Fourth Amendment search occurs only where a reasonable expectation of privacy exists under *Katz's* two part test. *Katz*, 389 U.S. at 360.

In order to prevail on summary judgment, Mr. Bonneville must first show that he had a "subjective expectation of privacy that is objectively reasonable." *United States v. Taketa*, 923 F.2d 665, 670 (9th Cir. 1991) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Assuming that Mr. Bonneville possessed a *subjective* expectation of privacy in the Illahee property such that he intended to exclude county officials, his expectation is not *objectively* reasonable in these circumstances.

First, the Plaintiff applied for numerous construction permits and a Building Clearance, all of which require inspections by the county to ensure compliance. Dkt. 54, at 19-20; 27-3, at 14; Kitsap County, Wash., Code § § 14.04.265, .860. Moreover, the Plaintiff had a history of requesting that permits be re-issued after the permits had been revoked for non-compliance. In this particular instance, Plaintiff's Building Clearance had been revoked on December 16, 2005, due to non-compliance (Dkt. 27-3, at 14), and on December 19, 2005, Plaintiff received notice that his DCD building permits had been revoked because construction work had gone beyond the scope of the permits. Dkt. 27-2, at 17. Around

December 22, 2005, Mr. Bonneville contacted Kerrie Crawford with the Health District to a request a re-issuance of the Building Clearance that had been revoked. Dkt. 27-2, at 11. The inspection at issue took place on January 18, 2006. Given these facts, it is not objectively reasonable for the Plaintiff to maintain an expectation of privacy where he calls the Health District to request a re-issuance of a Building Clearance, which requires an inspection, and the Health District conducts that inspection. The Plaintiff was aware that the Health District would need to enter his property after his request. And, although the Plaintiff at several points asserts that he "never consented to the searches and was never even asked to consent to them," (Dkt. 62, at 2), he contradicts himself by also asserting that he "encouraged Defendant Thomas Wiggins to inspect the property for a ninth time to determine the lack of an illegal septic system." Dkt. 47, at 22.

Second, Mr. Bonneville's subjective expectation of privacy is not objectively reasonable because he did not live on the property. Dkt. 49-1, at 24. Mr. Bonneville claims that at "relevant times a relative to live[d] at my Illahee property as a caretaker . . . . [and he] stayed there on weekends for recreation and while construction was ongoing." Dkt. 49-1, at 24. Mr. Bonneville did inform Health District employee, Kerrie Crawford, in December of 2005, that someone was living at the Illahee property (Dkt. 27-2, at12), but he does not allege, nor does the record show, that he told the Health District that he lived on the property or used the property on the weekends.

While the Fourth Amendment "was intended to protect against invasions of 'the sanctity of a man's home and the privacies of life' from searches under indiscriminate, general authority," *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 301 (1967) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)), it "protects people, not places." *Katz*, 389 U.S. at 351. Property interests do not control a Fourth Amendment analysis, and the reach of the Amendment does not turn on the absence or presence of a physical intrusion into any given enclosure. *See id.* at 353. Mr. Bonneville could not have had an objectively reasonable expectation of privacy in a property where he did not live and knew that Kitsap County Health District inspectors would need to access in order to re-issue a revoked permit.

Even if Mr. Bonneville's subjective expectation of privacy is objectively reasonable under *Katz's* first prong, his expectation of privacy must still be one that society is willing to recognize as reasonable under *Katz's* second prong. *Id.* at 360. In this case, Mr. Bonneville had been applying for permits for

varying construction projects on the Illahee property for over ten years. Dkt. 49-2, at 19. Mr. Bonneville never lived at the property, even though he at one point leased the property and at another used it as a weekend getaway. Dkt. 49-1, at 24. Throughout the years, the Health District had received multiple complaints from neighbors, tenants, and the DCD about illegal construction activities and improperly installed septic systems. Dkt. 27-3, at 9-14. Given such facts, society is not willing to recognize subjective privacy expectations of the Plaintiff where he applied for numerous building permits (which require County inspection), explicitly invited the Health District onto his property around nine or ten times, and repeatedly failed to comply with health and safety regulations regarding a waste management septic system.

In sum, the Kitsap County Health District's intrusions onto the Plaintiff's property do not amount to Fourth Amendment violations. The Health District observations of code violations were from an "open field" advantage. In addition, the Health District did not conduct a "search" within the meaning of the Constitution because the Plaintiff's manifestation of a subjective expectation of privacy was not objectively reasonable, and society is not willing to recognize that subjective expectation as reasonable.

c. Kitsap County Health District Inspection on March 14, 2006 of the Illahee Property

The record concerning the March 14, 2006, inspection of the Illahee property by the Health District is not well developed. As noted above, the Health District fails to brief the Court on this issue and the Plaintiff fails to allege any specific facts. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan*, 497 U.S. at 888-89. Consequently, Plaintiff fails to meet his burden under Federal Rule of Civil Procedure 56, and summary judgment should be denied.

Accordingly, to the extent that Plaintiff moves the Court for Summary Judgment as to the four Health District inspections, his motion should be denied. Conversely, Defendants Kitsap County Health District, Mr. Quayle, and Mr. Wiggins' motion for Summary Judgment regarding these inspections should be granted. As no action on behalf of Mr. Quayle or Mr. Wiggins violated the Plaintiff's constitutional rights on the facts alleged, qualified immunity is appropriate. *See Boyd*, 374 F.3d at 778. And, where "no constitutional right would have been violated were the allegations established, there is no necessity for further inquires concerning qualified immunity. *Saucier*, 533 U.S. at 201.

d. Kitsap County DCD, Stephen Mount, and Michael Barth Inspections on December 12, 2006, and January 18, 2006, of the Illahee Property

Plaintiff alleges that on "December 12, 2005, Defendants Mount and Barth conducted a non-consensual, warrantless search and seizure at the Illahee property and made a complaint to Defendant Kitsap County Health District." Dkt. 49-1, at 5. Plaintiff does not allege specific facts regarding this "search." However, Mount and Barth allege the following facts:

> On December 12, 2005 . . . . [we] went to the property to contact persons on the property regarding a complaint that work was being performed without or beyond the scope of a permit. We accessed the property via the access way, through the unlocked gate . . . . When on the property, we encountered one of the workers, "Bob", [sic] who was invovled in the construction activities. We informed "Bob" why we were at the property and requested that he show us what work was being performed.

Dkt. 55, at 2. Defendants Mount and Barth further allege that they took pictures but did not remove any item from the property. Dkt. 54, at 2. It is not clear whether the Defendants entered any of the buildings.

During the inspection, Mr. Mount and Mr. Barth confirmed that work was being done beyond the scope of the permit. Dkt. 27-3, at 11. The workers were told to stop all work and to have the property owner contact the DCD. Dkt. 27-3, at 11. Subsequently, the DCD issued a stop work order. Dkt. 27-3, at 11.

The second alleged search and seizure occurred approximately one month later. As described in detail above, Plaintiff alleges that on January 18, 2006, Mr. Mount, Mr. Quayle, and Mr. Barth conducted a "non-consensual, warrantless search and seizure at the Illahee property." Dkt. 49-1, at 5. The Defendants admit they entered the property via the access route and found no one present on the property. Dkt. 55, at 2. The basement of the residence was open and unoccupied, as well as the boathouse, which had previously been declared a "dangerous building." Dkt. 55, at 2. The Defendants entered these two structures and took pictures but did not remove any item from the property. Dkt. 55, at 2.

Based on the record, the December 12, 2005, and January 18, 2006 inspections by DCD employees, Mr. Mount and Mr. Barth did not amount to an unconstitutional search and seizure. The same reasoning as applied above in the Health District entries applies to the DCD entries. First, the Plaintiff may have held a subjective expectation of privacy, but that expectation was not objectively reasonable. *See Taketa*, 923 F.2d at 670. Second, society is unwilling to recognize that expectation as reasonable. *See Ciraolo*, 476 U.S. at 211.

Mr. Bonneville's subjective expectation of privacy is not objectively reasonable because, similarly to the Health District, he had established an ongoing permit application and inspection course of dealing with the DCD. *See* Dkt. 54, at 18-21. Beginning in 2001, Mr. Bonneville applied for and received multiple permits for the single-family residence, the boathouse, and the cabana at the Illahee property. Dkt. 54, at 18-21; Dkt. 27-3, at 10-11.

Although the long, convoluted history of the construction process at the Illahee property is not directly at issue here, the history of applications and inspections are relevant inasmuch as the County and the Plaintiff had established a relationship and a pattern of behavior. During the majority of the site visits to the property, either the Plaintiff or construction workers were present and allowed the inspectors to look around the property. Dkt. 55, at 7. The Plaintiff routinely sent his agents to conduct business with the DCD *(see* Dkt. 47, at 22), and DCD employees typically encountered these agents or the Plaintiff at the property. Dkt. 55, at 4. Because the DCD and Plaintiff had dealings going back more than ten years (Dkt. 49-2, at 19), and the Plaintiff had invited the DCD onto his Illahee property on many occasions, Plaintiff's expectation of privacy on these particular occasions was not *objectively* reasonable.

Even if Plaintiff's subjective expectation of privacy had been objectively reasonable, Plaintiff's subjective expectation of privacy was not one society recognizes as reasonable. *See Ciraolo*, 476 U.S. at 211. The DCD was responding to a complaint of illegal work (Dkt. 54, at 2), the property was not occupied by the Plaintiff (Dkt. 55, at 2), the DCD employees followed a "knock and talk" method of investigation (Dkt. 55, at 3; Dkt. 49-1, at 7), and the Plaintiff had a history of applying to the DCD for remodel permits for the Illahee property (Dkt. 49-2, at 19).

Here, the methods used by the Defendants were naked eye observations and camera pictures of the interior and exterior of the structures. *See* Dkt. 55, at 2. While, "[v]isual observation is no 'search' at all," and "the lawfulness of warrantless visual surveillance of [the exterior of] a home has still been preserved," *Kyllo*, 533 U.S. at 32, the "Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). "At the very core [of the Fourth Amendment] stands the right of a man to retreat *into* his *own home* and there be free from unreasonable government intrusion." *Id.* at 31 (emphasis added) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

As noted above, the Fourth Amendment is designed to protect the "intimate activities" that occur in a home, *Oliver*, 466 U.S. at 179, but protects "people, not places." *Katz,* 389 U.S. at 351. This necessarily means that the Fourth Amendment protects the structures in which a person resides, and not structures which are not occupied by the Plaintiff, where no expectation of a right to privacy can reasonably exist. *See U.S. v. Barajas-Avalos,* 377 F.3d 1040, 1057-59 (9th Cir. 2004). Thus, even though Defendants entered into the single family residence and other structures on the Illahee property, their entrance does not offend the Constitution.

Further, the purpose behind the DCD intrusion was of a health and safety nature, not a criminal nature; thus, society is less willing to recognize a governmental intrusion as unreasonable. Other courts have held that visits by building inspectors, even though the inspectors entered the house or the curtilage without the owner's consent, did not violate the Fourth Amendment when the inspectors entered the home in a minimal way for the purpose of enforcing a code provision. *See Artes-Roy v. City of Aspen,* 31 F.3d 958 (10th Cir. 1994) (building inspector who entered house to issue stop work order did not violate the Constitution); *Widgren*, 429 F. 3d at 583-85 (zoning administrator and tax assessor did not violate the Fourth Amendment when they inspected the exterior of a house for code compliance and tax purposes).

Applying these principles to the instant case, the Defendants' actions were not unduly intrusive. They took pictures and made naked-eye observations of the interior and exterior of structures not occupied by the Plaintiff. They made these observations for the purpose of assessing compliance with the county building codes, which they had been doing periodically throughout the last few years without complaint from the Plaintiff. Therefore, under these facts, the Defendants' actions did not amount to a Fourth Amendment search.

Accordingly, to the extent Plaintiff moves for summary judgment as to these two inspections, his motion should be denied. To the extent Defendants Kitsap County, Mr. Mount, and Mr. Barth move for summary judgment regarding these Illahee inspections, summary judgment should be granted. As no action on behalf of Mr. Mount or Mr. Barth violated the Plaintiff's constitutional rights on the facts alleged regarding the Illahee property, qualified immunity is appropriate. *See Boyd*, 374 F.3d at 778. Therefore, there is no necessity for further inquires concerning qualified immunity. *See Saucier*, 533 U.S. at 201.

e. Kitsap County DCD, Stephen Mount, and Michael Barth Inspections on February 1, 2006, and February 9, 2006 of the Bethel-Burley Property

On February 1, 2006, Mr. Mount and Mr. Barth entered the Plaintiff's Bethel-Burley property and observed a single wide mobile home that the Plaintiff had stored in a clearing.  Dkt. 54, at 3.  The Defendants claim they visited the property "because it appeared that Plaintiff was installing a mobile home without a permit."  Dkt. 54, at 3.  However, the Plaintiff asserts that "Defendants Mount and Barth, of their own volition, traveled on the property even though no permits had ever been taken out for that property."  Dkt. 49-1, at 8; Dkt. 27-5, at 1.  The Plaintiff contends that the Defendants "went past two closed gates, a chained barricade and several no trespassing signs in order to take pictures and obtain evidence of alleged code violations."  Dkt. 49-1, at 8; Dkt. 27-5, at 11-13.  The Defendants, on the other hand, claimed that, at the time of their visit, the property "contained no fencing, no cable gates, and no "No Trespassing" signs.  Dkt. 54, at 3.

As a result of the visit, the Plaintiff was issued a citation for installing the manufactured home without a permit.  Dkt. 27-5, at 8; Dkt. 54, at 6.  Later, however, the County learned that the Plaintiff had obtained the proper permitting to move the trailer.  Dkt. 27-5, 9-10.

On February 9, 2006, Robyn Myers and Jason Rice performed a "follow up" visit to determine whether the trailer was improperly installed on wetlands without a permit.  Dkt. 58, at 1-3; Dkt. 53, at 5.  Ms. Myers confirmed that the trailer was placed in a wetland (Dkt. 58, at 2), and as a result, Mr. Bonneville was issued a second citation.  Dkt. 27-5, at 16.

The two Bethel-Burley citations are currently the subject of litigation in the Kitsap County District Court, and a hearing is scheduled for January 31, 2007.  Dkt. 68, at 2.  The record is less than clear about what issues are before the Kitsap County District Court. See Dkt. 68, at 1-2; Dkt. 53, at 17-20.  Because of the ongoing Kitsap County District Court litigation, Defendants Kitsap County, Stephen Mount, and Michael Barth ask this Court to stay the proceedings according to the doctrines of res judicata and *Heck v. Humphrey*, 512 U.S. 477 (1994).  Dkt. 54, at 17.

Res judicata does not apply in this action as to the Bethel-Burley site visits because there has been no prior final judgment on the merits. *See San Remo Hotel, L.P. v. County of San Francisco*, 545 U.S. 323, 336 (2005) ("Under res judicata, *a final judgment on the merits* of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (emphasis added).  Further, the Defendants provide almost no background on the state court proceedings, leaving

this Court with little to do but conjecture as to the nature and scope of the issues before the state court. This Court declines to engage in guess-work.

The Defendants have also failed to show that the *Heck* doctrine applies in this case. *See Heck*, 512 U.S. at 480, 486-87. *Heck* concerned "the intersection of the two most fertile sources of federal-court prisoner litigation . . . 42 U.S.C. § 1983, and the federal habeas corpus statute." *Id.* at 480. The Supreme Court in *Hec*k held that in order to recover damages for an alleged "unconstitutional conviction or imprisonment . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal . . . . [and a] claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under §1983." *Id.* at 486-87. The Defendants fail to show that the *Heck* doctrine extends to civil cases like the one at hand.

For the foregoing reasons, Defendant's request for a stay should be denied without prejudice. Thus, the Court now turns to the merits of the Plaintiff's Bethel-Burley claim.

This Court agrees with the Plaintiff that where "observation of incriminating evidence is from a constitutionally protected area, the inspection constitutes a search under the [Federal Constitution]." Dkt. 49-1. In this matter, however, no search of a "constitutionally protected area" occurred. An observation of an unoccupied trailer on an undeveloped parcel of land does not constitute a search where the observation is made from an open field or public land. *Dunn*, 480 U.S. at 298. Even if Plaintiff's allegations are true that Mr. Mount and Mr. Barth crossed over several fences and passed "No Trespassing" signs, their inspections of the Bethel-Burley property did not amount to a violation of the Fourth Amendment because the Bethel-Burley property constituted an "open field" and the mobile home was vacant.

"[T]he government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the Fourth Amendment." *Dunn*, 480 U.S. at 303-04 (quoting *Oliver*, 466 U.S. 177). In *Dunn*, the Supreme Court found no Fourth Amendment violation where officers crossed over the property owner's ranch-style fence and several interior fences to peer into a locked barn. *Id.* at 304. Similarly, in *Oliver*, the Supreme Court found that the officers did not conduct an unreasonable search where they drove past the property owner's house to a locked gate with a "No Trespassing" sign in an area "bounded on all sides by woods, fences, and embankments," and could not "be seen from any

point of public access." *Oliver*, 466 U.S. at 173.  The Court explained that "an individual may not legitimately demand privacy for activities conduct out of doors in fields, except in the area immediately surrounding the *home*." *Id.* at 178 (emphasis added).

Thus, the dispositive question is whether Plaintiff's trailer was a "home" within the meaning of the Fourth Amendment and whether, consequently, the area surrounding the trailer constituted protected curtilage.  Clearly, under Ninth Circuit precedent, Mr. Bonneville's trailer does not constitute a "home," and is thus an "open field."  *See Barajas-Avalos*, 377 F.3d 1040.

In *U.S. v. Barajas-Avalos*, 377 at 1056-59, the Ninth Circuit addressed a factually similar situation.  There, the court held that a warrantless police search of an unoccupied travel  trailer in which methamphetamine manufacturing was conducted did not violate the owner's Fourth Amendment rights because the trailer was not a "home," and thus the clearing around it was not "curtilage." *Id.*  The Plaintiff, Ramone Barajas, testified that he and his father occasionally slept in his travel trailer, which was located on a densely wooded, thirty-acre parcel of rural land and was fenced with barbed wire and posted with "No Trespassing" signs. *Id.* at 1052, 1057.  Despite this evidence that Mr. Barajas attempted to keep the public off his property, the court held that Mr. Barajas's trailer was not protected as a "home" within the meaning of the Fourth Amendment.  The agents observed no signs of residency, the owner in fact lived somewhere else, utilities were not hooked up, and the alleged occasional overnight sleeping by the owner's father was not enough to show residence. *Id.* Because Mr. Barajas of these facts, the court concluded the following:

> The totality of the circumstances related by the officers, based on their observations from the open field surrounding the travel trailer, were sufficient to support an inference that the travel trailer was not used as a home.  Therefore, the natural clearing surrounding it was not protected from trespass by the Fourth Amendment.

*Id.* at 1056-58.

Likewise, Mr. Bonneville did not occupy the mobile home located on his Bethel-Burley property.  Dkt. 54, at 3.  Mr. Bonneville in fact lives elsewhere, the Bethel-Burley property was undeveloped, and no utilities were hooked up to the mobile home.  Dkt. 54, at 3; Dkt. 49-1, at 8.  Assuming that all of Mr. Bonneville's factual statements are correct (that is, the Bethel-Burley

property is not visible from the road, and the Defendants crossed several fences and passed "No Trespassing" signs (Dkt. 49-1, at 8)), Mr. Bonneville's Fourth Amendment claims still fail. The record clearly shows that the mobile home was not used as a "home" by Mr. Bonneville and thus constituted an open field. Therefore, the entries onto the land surrounding the mobile home by Mr. Mount, Mr. Barth, Mr. Rice, and Ms. Myers did not violate the Plaintiff's Fourth Amendment rights.

Where "no constitutional right would have been violated were the allegations established, there is no necessity for further inquires concerning qualified immunity." *Saucier*, 533 U.S. at 201.

To the extent Plaintiff moves this Court for summary judgment regarding the inspections of his Bethel-Burley property, Plaintiff's motion should be denied. To the extent Defendants move this Court for summary judgment regarding these inspections, summary judgment should be granted and Defendants are entitled to qualified immunity.

### C. ARTICLE 1, SECTION 7 OF THE WASHINGTON CONSTITUTION CLAIM

The Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Wash. Const. art. I, § 7. The state constitutional prohibition against unreasonable searches and seizures has broader application than the Fourth Amendment of the U.S. Constitution. *Centimark Corp. v. Dep't of Labor and Industries*, 129 Wn. App. 368, 374 (2006). The determination of whether an unlawful search has occurred under Article 1, Section 7 of the Washington Constitution "depends on whether the government violat[ed] a subjective expectation of privacy that society recognizes as reasonable." *Id.* at 376. The government has the burden of showing that a warrantless search falls within in an exception to the warrant requirement. *Robinson v. City of Seattle*, 102 Wn. App. 795, 813. As the Fourth Amendment analysis shows, the government here has not violated a subjective expectation for privacy that society recognizes as reasonable.

The Plaintiff argues that this Court should follows the Washington Supreme Court's reasoning in *State v. Browning*, 67 Wn. App. 93 (1992). There a building inspector arrived at the home of Michele Browning for a final inspection. *Id.* at 94. He did not present credentials. *Id.* Ms. Browning did not explicitly consent to the inspection, but went back inside her house. *Id.* at 95. During his

inspection, the government official observed unauthorized construction which led him to a room concealing marijuana plants. *Id.* The Washington Supreme Court found that the building inspector entered the residence unlawfully because Ms. Browning did not consent to entry, the inspector did not present his credentials, and the inspector did not comply with the Uniform Building Code (UBC). *Id.*

*Browning* is distinguishable from this case. In *Browning* the inspector entered a family home after the owner refused entry. Here, the Plaintiff did not live on the property and was not present at the time of the inspections at issue. Plaintiff's reasonable expectation of privacy in his Illahee property was much less than that of the family residence in *Browning*. Further, in *Browning* a "search" occurred. Here, no "search" occurred; rather, inspectors had an open view of the code violations. *Browning* stands for the proposition that a government official may not invade a private home when the owner denies entry; *Browning* does not stand for the proposition that health inspectors or building officials may not inspect a property where the owner does not reside and has pending permit applications and reported code violations.

To the extent Plaintiff moves this Court for summary judgment regarding the inspections of his property based on Article 1, Section 7 of the Washington Constitution , Plaintiff's motion should be denied. To the extent Defendants move this Court for summary judgment regarding these inspections, summary judgment should be granted.

**D. PERMANENT INJUNCTION REQUEST**

The Plaintiff moves this Court to issues a permanent injunction prohibiting the Defendants from conducting non-consensual, warrantless searches, claiming that he is "entitled to a permanent injunction prohibiting warrantless entries onto his properties to include the curtilage as defined in *Conner, Dunn, and Johnson*." Dkt. 49-1, at 21. The Plaintiff also asks the Court to "enlarge the injunction to prohibit defendants from entering any citizen's property without warrant." Dkt. 49-1, at 21.

The Plaintiff's request for a permanent injunction should be denied. The Plaintiff fails to make the necessary showing required to support an injunction. Additionally, the injunction requested by the Plaintiff is too broad.

The Plaintiff fails to address any of the elements necessary in determining whether an injunction is appropriate. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982).  A plaintiff seeking a permanent injunction must demonstrate the following: (1) that he has suffered an irreparable harm; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Id.*  The Plaintiff merely states that the "Court should grant Plaintiff's request for injunctive relief for nothing less will protect the citizens of Kitsap County from the misguided zeal of these Defendants." The Plaintiff does not demonstrate to this Court how the four prong test for a permanent injunction can be satisfied.

Further, the injunction requested by the Plaintiff would prohibit the County from conducting any inspection of any person's property without a warrant, no matter what circumstances exist. *See* Dkt. 49.  Such an injunction would be too broad.

## III.    ORDER

Therefore, it is hereby **ORDERED** that:

- Plaintiff's Motion for Summary Judgment and Injunctive Relief Pursuant to Fed. R. Civ. P. 56(a) and 65 (Dkt. 49-1) is **DENIED**.  Plaintiff's claims against Defendants for violations of the Fourth Amendment of the U.S. Constitution and violations of Article 1, Section 7 of the Washington Constitution for inspections conducted at the Illahee and Bethel-Burley properties are **DISMISSED WITH PREJUDICE**.

- Defendants Kitsap County, Stephen Mount, and Michael Barth's Cross Motion for Summary Judgment (Dkt. 53) is **GRANTED**.  All claims against Defendants Stephen Mount and Michael Barth regarding  violations of the Fourth Amendment of the U.S. Constitution and violation of Article 1, Section 7 of the Washington Constitution for inspections conducted at the Illahee and Bethel-Burley properties are **DISMISSED WITH PREJUDICE**.

- Defendants Kitsap County Health District, Timothy Quayle and Thomas Wiggins' Cross Motion for Summary Judgment (Dkt. 57) is **GRANTED**.  All claims against Defendants

Timothy Quayle and Thomas Wiggins regarding violations of the Fourth Amendment of the U.S. Constitution and violations of Article 1, Section 7 of the Washington Constitution for inspections conducted at the Illahee property are **DISMISSED WITH PREJUDICE**.

- Defendants Kitsap County, Stephen Mount, and Michael Barth's Motion for a Stay (Dkt. 53) is **DENIED WITHOUT PREJUDICE**.
- The claims not raised or addressed, which include (1) Defendants violation of Plaintiff's Due Process and Equal Protection rights under both the federal and state constitutions contrary to 42 U.S.C. § 1983 and state common law, and (2) Defendants conspiracy to violate Plaintiff's constitutional rights contrary to 42 U.S.C. § 1985(3), may proceed, at least to further motions practice.
- The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 8th day of February, 2007.

Robert J. Bryan
United States District Judge